# EXHIBIT A

# Complaint

E-FILED
THURSTON COUNTY, WA
SUPERIOR COURT
05/06/2026 - 3:22PM
Linda Myhre Enlow
Thurston County Clerk

☐ EXPEDITE
☒ No hearing set
☐ Hearing is set
Date: _____
Time: _____
Judge: _____

STATE OF WASHINGTON
THURSTON COUNTY SUPERIOR COURT

WILLIAM BLACK and BESS BYERS, on their own behalf and on behalf of all those similarly situated,

Plaintiffs,

v.

WASHINGTON STATE DEPARTMENT OF LICENSING,

Defendant.

26-2-02804-34

CLASS ACTION COMPLAINT
WITH JURY DEMAND

Plaintiffs William Black and Bess Byers ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against the Defendant Washington State Department of Licensing ("DOL") and allege, upon personal knowledge as to each of their own actions and their counsel's investigation, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1. DOL collected, stored, managed, and transmitted Plaintiffs' and Class members' personal information, including their names, Social Security numbers, dates of birth, driver's license numbers, addresses, photographs, and other sensitive personally identifying information ("PII").

2. DOL knew that the security protocols it implemented and maintained to safeguard this information from theft were inadequate.

CLASS ACTION COMPLAINT - 1
BLACK v. DOL (THURSTON CNTY. SUP. CT.)



3. DOL also knew that unauthorized persons were actively targeting its unsecured systems exploiting its unsecured systems to steal the identities of Washington residents.

4. Rather than secure its systems or take them offline, DOL failed to cure its known security vulnerabilities.

5. Even after it recognized improper access of its systems, DOL refused to eliminate the "No Logon" path in the system it had built, that resulted in DOL disclosing the personal information of every Washington resident in its system—nearly every adult in Washington.

6. When investigators identified that data had been disclosed, due to identifying specific victims of identity theft through the DOL system, DOL knew that the mechanism used for that identity theft access remained in place, but DOL still did not secure its systems.

7. It also refused to comply with its legal obligation to inform the people whose data it had disclosed as required by RCW 42.56.590, the agency data breach notification statute.

## II. JURISDICTION AND VENUE.

8. This Court has jurisdiction over this cause of action under RCW 2.08.010 and RCW 4.92.090.

9. This Court has personal jurisdiction over DOL because it is a Washington State agency.

10. Venue is proper in this Court pursuant to RCW 4.12.025 and RCW 4.92.010.

## III. PARTIES.

11. Plaintiff William Black is an individual and Washington resident.

12. Plaintiff Black has had a valid Washington driver's license from before 2015.

13. Plaintiff Bess Byers is an individual who at all relevant times resided in Washington.

14. Plaintiff Byers held a valid Washington driver's license from before 2015 through early 2022.

15. Defendant Washington Department of Licensing is a department of the executive branch of the state of Washington established under Chapter 43.24 RCW.

16. DOL is an "agency" within the meaning of RCW 42.56.010.

CLASS ACTION COMPLAINT - 2
BLACK v. DOL (THURSTON CNTY. SUP. CT.)

ARD LAW GROUP

# IV. FACTS.

## A. The License eXpress Data Disclosure.

17. On September 4, 2018, DOL launched two interconnected systems built by FAST Enterprises, LLC ("FAST").

18. The first was DRIVES, a new back-end driver licensing database.

19. The second was License eXpress (referred to by DOL as the "LX Portal"), a customer-facing web portal through which the public could access driver licensing services online.

20. DOL and FAST deployed these systems simultaneously as a single integrated platform.

21. From that date forward, the License eXpress system contained the personally identifying information—including names, Social Security numbers, dates of birth, driver's license numbers, addresses, photographs, and physical descriptions—of every person with a Washington driver's license or ID.

22. License eXpress included two pathways for the public to access driver licensing services.

23. The first pathway required users to create a Secure Access Washington ("SAW") account—the state's standard authentication system, operated by WaTech—and log in with a username and password.

24. The second, known internally and in the URL structure as the "No Logon" path, required no account, no login, and no authentication of any kind.

25. Instead, the No Logon path asked users to provide personally identifying information—a driver's license number, name, and date of birth.

26. A person could include the last four digits of a Social Security number, though DOL has publicly acknowledged that this field was required only "if applicable." *See* Exhibit A.

27. The No Logon path was not a misconfiguration or an accidental exposure.

28. WaTech, the state's centralized technology agency, publicly advertised a hosting service called "Fortress Anonymous" (at https://watech.wa.gov/services/security/fortress-anonymous) that allowed state agencies to run web applications on state infrastructure without requiring user login.

CLASS ACTION COMPLAINT - 3
*BLACK v. DOL* (THURSTON CNTY. SUP. CT.)

ARD LAW GROUP

29. On information and belief, DOL chose to host the License eXpress No Logon path on the Fortress Anonymous platform, deliberately routing sensitive driver licensing transactions—including address changes and replacement license orders—through an unauthenticated channel.

30. WaTech also offered authenticated alternatives, including the SAW system, meaning the decision to use an unauthenticated pathway was a choice among available options.

31. The No Logon path was publicly accessible at the URL https://fortress.wa.gov/dol/extdriveses/NoLogon/ and was directly linked from DOL's own website at https://dol.wa.gov/driver-licenses-and-permits/renew-or-replace-driver-license and from https://alt.dol.wa.gov/driverslicense/replacelostlicense.html.

32. This advertised that Washington residents could "Replace online without creating an account."

33. Through the No Logon path, any member of the public could access another person's driver's license record, change the address associated with that record, and order a replacement driver's license or ID card mailed to the new address—all without creating an account or providing any credential beyond PII.

34. After accessing the record, the person could change the address associated with the driver's license or ID. (Hereafter, both forms of Washington state-issued ID are referred to jointly as a "driver's license").

35. The verification DOL required on the No Logon path was not merely weak, it was circular.

36. Before September 4, 2018, Washington driver's license numbers were not randomly assigned.

37. Instead, DOL encoded the first five letters of the holder's last name, the holder's first and middle initials, and a numeric sequence derived from the holder's date of birth directly into the license number itself.

38. DOL knew this format embedded PII into the license number.

39. DOL's own stated reason for changing to a new random-format number (prefixed "WDL") on September 4, 2018, was to protect privacy.

40. In fact, any person could generate a Washington driver's license number based on only a person's name and birthdate.

41. This weakness was so well known that websites *still* exist that demonstrate how to exploit that weakness, and either generate a drivers' license number from a name and birthdate, or take a known driver's license number and identify the person's surname (five characters), initials, and birthdate. *See, e.g.*, Exhibit K.

42. The new WDL-format numbers applied only to newly issued cards.

43. DOL projected that the conversion would take a full six years—until approximately 2024—before all licenses in circulation adopted the new format.

44. During that entire transition period, millions of Washingtonians continued to carry old-format license numbers that could be reconstructed from publicly available biographical information: the holder's name and date of birth.

45. For approximately the first six years of the No Logon path's existence—from September 2018 through approximately 2024—the "verification" DOL required was self-defeating by design.

46. The No Logon form asked users to enter a driver's license number, name, and date of birth.

47. But for any holder of an old-format license, the license number itself could be derived from the name and date of birth that the form also required.

48. The form asked users to prove their identity by entering information that could be computed from other information the form also required.

49. An attacker did not need access to a stolen database or a prior data breach.

50. Indeed, any person can request the complete voter registration database from the Secretary of State, because that list is a public record.

51. The voter registration database includes the name and date of birth of every registered voter in Washington.

52. On information and belief, nearly every person, with a drivers license in the state of Washington is also registered to vote.

53. Because the old-format, automatically generated license number, any person could request the voter registration database, then generate the driver's license number for any registered voter because the voter registration database has the full name and birthdate of every registered voter.

54. In short, any person could (a0 request the voter registration database; (b) reverse-engineer the driver's license number for any registered voter; and (c) use the information from the voter registration database to use the "No Logon" access point on License eXpress to access the PII of any person in Washington.

55. Even after the old-format license numbers began cycling out of circulation, the No Logon path remained exploitable.

56. The personally identifying information required to satisfy the verification—driver's license number, name, date of birth—was widely available from prior data breaches affecting Washington residents, including the Equifax breach of 2017 and the T-Mobile breach of 2021, among many others.

57. Beginning in late 2018, DOL faced massive identity theft through the No Logon path, apparently from many different sources, continuing for years.

58. In at least one form of fraud perpetrated as a result of DOL's negligence, people routinely accessed License eXpress to change the address of Washingtonians' driver's licenses, and would then request a new license for that person sent to the new address.

59. This was blatant and unmistakable fraud, especially because fraudsters would pay for dozens or hundreds of new driver's licenses to be sent to the same address.

60. It was also blatant and unmistakable fraud because the person ordering dozens or hundreds of new driver's licenses would often use the same email address for all the orders.

61. DOL began to investigate not long after the problem came to light.

62. DOL's own investigators confirmed the attack vector in writing.

63. A May 15, 2024 letter signed by DOL Investigator Andrew Nunes of the Driver and Vehicle Investigations unit, Programs and Services Division, stated: "The person used the Washington

State, Department of Licensing, No Logon online services website to request and obtain the document." *See* Exhibit E.

64. DOL assigned the investigation to the Driver & Vehicle Investigations Unit at DOL.

65. Lead DOL investigator Kyle Muller appears to have assigned DOL case number 19-0109 to an early tranche of identified victims, amounting to between 300 and 400 victims.

66. Muller or someone else at DOL started a shared Excel spreadsheet titled "19-0109 LX Case Spreadsheet (WORKING)" with columns for the victim's name, license number, DOB, the email address used to access records, how the new license was paid for, the address it was sent to, the number of victims, etc.

67. DOL promptly recognized that the access process being used was not technically difficult.

68. In 2020 or early 2021, as the number of cases continued to grow, with hundreds of new successful identity thefts a month, DOL, through its senior employee JoAnna Shanafelt, finally sought assistance from WSP.

69. At this point, over 1,000 successful thefts had already occurred, often with dozens or hundreds of driver's licenses sent to a single apartment in King County.

70. However, every time DOL sent WSP investigators to a specific recipient address, it would cease to receive licenses, while another address would pop up.

71. Purchasers also used pre-paid cards to pay for the licenses, making it nearly impossible to track them through financial channels.

72. Nonetheless, the basic process continued: People would change batches of information, pay for DOL to mail batches of new driver's licenses to a new address, with all the driver's licenses in a batch sent to the same address.

73. This continued for years.

74. The access problem, all this time, was known to DOL.

75. This aspect cannot be understated: ***DOL knew exactly what the problem was, from the earliest days.***

CLASS ACTION COMPLAINT - 7
*BLACK v. DOL* (THURSTON CNTY. SUP. CT.)

ARD LAW GROUP

76. But it refused to take any steps to eliminate the wide open door that disclosed the driver's license information of all Washington residents.

77. DOL took no steps to prevent further unauthorized access and identity theft from Washington residents.

78. In or around 2024, DOL was informed by WSP that that the workload of hundreds of new cases a month was more than WSP could handle, and that until DOL remediated the security flaw that was allowing people to steal the identity of thousands of Washingtonians a year, WSP could not take on the constant flood of more cases.

79. DOL still refused to remediate the problem!

80. It made excuses about how fixing its system would cost too much, but despite knowing the exact nature of the system problem, it refused to take any remedial steps.

81. As a result of DOL's conduct—at best, negligence—every Washingtonian with a driver's license must assume that his or her vital personal information was accessed.

82. DOL only tracked and investigated the most blatantly obvious access: where an actor changed a batch of driver's license addresses and had dozens or hundreds of replacement driver's licenses sent to the same new address.

83. But given that DOL disclosed all its driver's license data, including every piece of information DOL stored about Washingtonians, many people's data could have been stolen without DOL even knowing.

84. Indeed, every single person in Washington with a driver's license (including expired licenses, IDs, CDLs, and every form of personal identification issued by Washington), has had his or her vital personally identifying information disclosed by DOL.

85. DOL finally remedied the flaw in February 2025.

86. Archived copies of DOL's website, preserved by the Internet Archive's Wayback Machine, establish the precise timeline.

87. The No Logon path at https://fortress.wa.gov/dol/extdriveses/NoLogon/ returned a normal HTTP 200 response as late as February 5, 2025 (archived at

https://web.archive.org/web/20250205220833/https://fortress.wa.gov/dol/extdriveses/No Logon/_/).

88. By February 15, 2025, the same URL returned an HTTP 404 "Not Found" error (archived at https://web.archive.org/web/20250215002910/https://fortress.wa.gov/dol/extdriveses/No Logon/_/), and it has returned 404 on every subsequent probe.

89. DOL took License eXpress offline from February 10 through February 18, 2025.

90. On January 14, 2025, DOL announced the planned outage on a licensingexpress.wordpress.com blog post, stating that "System upgrades will enhance customer service, add security features, and better support mobile devices."

91. DOL did not disclose that the "security features" included closing the unauthenticated No Logon pathway that had exposed every Washington driver's license holder's PII for over six years.

92. On or about February 21, 2025, DOL began routing equivalent functionality through a new URL at https://fortress.wa.gov/dol/extdriveses/ESP/NoLogon/ (first archived at https://web.archive.org/web/20250221040957/https://fortress.wa.gov/dol/extdriveses/ESP/NoLogon/_/).

93. DOL simultaneously rewrote its public-facing pages at dol.wa.gov to replace links pointing to the old /NoLogon path with links pointing to the new /ESP/NoLogon path, and changed the system's branding from "License eXpress" to "License Express."

94. DOL did not issue an HTTP redirect from the old URL to the new one, leaving every external document, agency email, and printed flyer that had linked to the old No Logon path pointing to a dead page.

95. Although DOL sent individual notification letters to victims it identified through batch-fraud investigations, DOL never complied with its obligations under the agency data breach notification statute, RCW 42.56.590, which requires notification to all affected individuals no more than 45 calendar days after discovery of a breach. DOL's selective notification of a small subset of identified victims did not satisfy the statute's requirement of notification to every

resident whose personal information was, or is reasonably believed to have been, acquired by an unauthorized person.

96. And in any event, DOL knew literally for years that all the driver's license data of every Washington resident was disclosed by License eXpress, but refused to fix the problem.

97. Its internal investigations tally thousands—perhaps tens of thousands—of people whose driver's license address was changed in one of the batch processes, with a new driver's license sent to a single address along with dozens or hundreds of other driver's licenses.

98. DOL's internal investigators recognized that these were obvious fraud: pre-paid credit cards, burner email addresses, never mind that no single apartment has 300+ residents such that merely mailing that many new driver's licenses to a single location was obviously indicative of fraud.

99. And despite that a technical fix was possible, DOL did nothing for over six years.

100.    Its conduct was at least negligent.

**B. DOL's Internal Response to the Breach.**

101.    Rather than remediate the vulnerability in License eXpress, DOL built a formalized bureaucratic apparatus to manage individual fraud cases while leaving the portal open.

102.    DOL's Driver and Vehicle Investigations ("DVI") unit maintained a suite of numbered internal procedures—DVI 05.A.001 through 05.A.902—governing every step of its response to online services fraud.

103.    These procedures, carrying effective dates of March 17, 2025, with revision dates ranging from late 2024 to early 2025, document a mature, multi-step fraud-response apparatus.

104.    Procedures 1, 3, 4, 6, and 7 have been produced pursuant to a Public Records Act request; 2 and 5 have not.

105.    The master procedure, DVI 05.A.001 ("Investigating Online Services Fraud"), attached hereto as Exhibit B, prescribed an eighteen-step workflow: receiving fraud allegations, placing "See DVI" indicators on victim accounts, contacting victims, pulling fraudulent issuances from the DRIVES Weblink interface, verifying identity, changing driver's license numbers,

issuing New Facial Recognition ("NFR") credentials, preparing victim notification letters, and searching for IP addresses and additional victims via DRIVES Snapshot Search.

106.    DVI maintained a centralized Online Fraud Spreadsheet in SharePoint, governed by a separate procedure (DVI 05.A.004, attached hereto as part of Exhibit C), that tracked every known fraud victim. The spreadsheet recorded each victim's name (formatted in a standardized FIRST MIDDLE LAST capitalized format), IP addresses with timestamps, email addresses, phone numbers, and usernames.

107.    On information and belief, this spreadsheet—which may be the same as or a successor to the "19-0109 LX Case Spreadsheet (WORKING)" started by Muller—documented the full scope of DOL's knowledge of the breach as it grew from hundreds of victims to thousands.

108.    DVI also maintained a Victim Contact Guide (DVI 05.A.902, attached hereto as Exhibit D) that scripted investigators' conversations with fraud victims.

109.    The Guide required investigators to complete an Online Services Fraud Intake Report during each victim contact, collecting information about which transactions were fraudulent, whether the victim had received issuances or other DOL communications, the victim's current address and contact information, any law enforcement or FTC case numbers, and any suspect information the victim could provide. DOL's investigators followed these procedures for years—processing individual cases one at a time—while the portal that generated those cases remained open.

110.    For victims DOL specifically identified through its batch-fraud investigations, DVI prepared notification letters from standardized templates. *See* Exhibit E.

111. These letters told victims that another person had "used the Washington State, Department of Licensing, No Logon online services website to request and obtain" a document using the victim's PII.

112.    But the letters systematically downplayed the breach.

113.    A separate template, used when DOL detected account access without a completed transaction, told the victim that "the person did not request any documents or change any of

your personal identifiable information"—a statement that, even if narrowly accurate for that particular access event, concealed the systemic nature of the vulnerability and the fact that DOL had known about it for years. *See* Exhibits F and G.

114. None of the notification letters disclosed that the vulnerability was systemic, that DOL had known about it since at least 2019, that thousands of other victims had been identified, or that every Washington driver's license holder's PII remained exposed through the same portal.

115. The letters stated that DOL "has not identified the subject"—without disclosing that DOL had also declined to close the pathway the subject used.

116. DOL's sole remediation for identified victims was to place a "See DVI" indicator and a DVI lock on the victim's account, preventing all online access through License eXpress.

117. This lock did not protect the victim's PII, which remained accessible through the same unauthenticated No Logon pathway.

118. It did, however, lock the victim out of his or her own account—punishing the victim for DOL's failure by stripping the victim's ability to use DOL's online services.

119. For victims who had opted into Driver History Protection ("DHP")—a privacy safeguard limiting access to driving records—DVI investigators sent internal requests to remove the protection so the investigation could proceed. *See* Exhibit H.

120. DOL stripped a privacy safeguard from the very people whose privacy DOL had already failed to protect.

121. DVI also submitted NFR Requests for new credentials, requiring supervisory approval and specifying the victim's address, license number, document types, physical characteristics, and veteran and organ donor status—confirming that the breach was severe enough to require replacement of the physical credential itself. *See* Exhibit I.

122. DOL's own internal communications confirm that the agency understood the severity of the exposure it refused to prevent.

123. DVI Investigator Chelsea Gould maintained a standardized email template sent to identified victims with an eight-step self-protection guide: (1) file a police report; (2) contact

the FTC and the Washington Attorney General; (3) freeze credit reports with Equifax, Experian, and TransUnion; (4) watch for DOL account-change emails; (5) watch for dishonored payment notices; (6) contact the Postmaster General about unauthorized mail holds or forwards; (7) sign up for USPS Informed Delivery to monitor mail; and (8) obtain a locking mailbox. *See* Exhibit J.

124. DOL recognized that the breach exposed victims to mail interception, financial fraud, and identity theft serious enough to warrant credit freezes, police reports, and physical mailbox security—while simultaneously refusing to close the portal that caused the exposure.

125. DOL applied this notification and remediation process only to the subset of victims it identified through batch-fraud investigations—those whose addresses had been changed and whose replacement licenses had been mailed to a suspicious address.

126. The millions of Washington residents whose PII was exposed through the same unauthenticated portal—but who were not part of an identified batch scheme—received no notification, no DVI lock, no investigator contact, and no self-protection guidance.

127. The existence of DOL's formalized DVI procedure suite—with its numbered procedures, SharePoint tracking, standardized victim contact scripts, letter templates, email templates, and multi-step workflows—confirms that DOL's failure to remediate the portal was not an oversight.

128. DOL invested the resources to build and maintain an entire bureaucratic infrastructure for processing individual fraud cases.

129. It chose to manage the consequences of the vulnerability rather than fix it.

**C. The Design, Implementation, And Maintenance Of The License eXpress System.**

130. On September 4, 2018, DOL, via its primary contractor FAST Enterprises, LLC, launched the DRIVES driver licensing database and the License eXpress web portal as a single integrated platform. The system contained the PII of Plaintiff and the Class from the date of launch.

131. FAST Enterprises, LLC ("FAST"), a private limited liability company organized under the laws of the state of Colorado, served as the primary systems integrator and contractor

ARD LAW GROUP

responsible for designing, building, and implementing the DRIVES system and the License eXpress portal for DOL. FAST's "FastDS" application framework powered the License eXpress front end, including the No Logon transaction flows.

132.   FAST's proprietary code controlled which data fields the No Logon forms required, what server-side validation those fields received, and whether any rate-limiting, bot-detection, or anti-fraud controls applied to unauthenticated transactions.

133.   The structural vulnerability was not a later-discovered bug.

134.   It was present from the September 4, 2018 launch.

135.   DOL and FAST made a deliberate architectural decision to route driver licensing transactions—including address changes and replacement license orders—through the unauthenticated No Logon pathway hosted on WaTech's Fortress Anonymous infrastructure, with no credential beyond PII that was, for millions of license holders, publicly derivable from the license number format DOL itself had chosen.

136.   DOL was responsible for the day-to-day operations, monitoring, maintenance, and configuration of the License eXpress system environments. This responsibility, among others, included ensuring that the system containing Plaintiffs' and Class members' PII remained reliable, secure, and insusceptible to unauthorized access.

137.   However, DOL instead designed and/or implemented License eXpress with inadequate safety and security protocols that were vulnerable to access by unauthorized users.

138.   Following implementation, DOL failed to test, monitor, and patch vulnerabilities in the License eXpress system, ensuring that the system remained susceptible to unauthorized access.

139.   DOL's failures in this regard created a system that was unreasonably susceptible to unauthorized access, jeopardized the PII of every Washingtonian with a driver's license, and ultimately resulted in the Data Breach.

140.   By failing to ensure that License eXpress was adequately secure, and by failing to test, monitor, and patch existing vulnerabilities, DOL fell short of its obligations, and also fell short of Plaintiffs' and Class members' reasonable expectations for the protection of their PII.

141.   DOL was aware, or should have been aware, that License eXpress was an inadequately secure system.

142.   DOL was aware, or should have been aware, that failing to test, monitor, and patch security vulnerabilities in License eXpress would jeopardize the PII of Plaintiff and the Class.

143.   Plaintiff reserves the right to amend this Complaint to name additional defendants, including but not limited to FAST Enterprises, LLC, and any other contractors involved in the design, implementation, or maintenance of the License eXpress system, as further investigation and discovery warrant.

**D. DOL's Data Security Commitments.**

144.   As part of DOL's Data Governance Policy 1.7.1, DOL stated: "This policy applies to all Department of Licensing (Agency) Employees and contractors as contract allows. . . . The Agency has an obligation to protect the privacy of the customers we serve."

145.   DOL stated in its May 2020 Data Stewardship Report: "The Washington State Department of Licensing is an agency of the State of Washington, a steward of data concerning the people of the state . . . Data is our principal asset, and the safety of data within the agency is an important component of the agency's strategy."

146.   DOL published the following privacy statement on its official website:

**Securing your information**

Keeping your information safe is so important to us, we made it a part of our purpose.

**Securing online transactions**

When you complete a transaction with us online (like renewing a license or reporting the sale of a vehicle) you're using our secure online services. . . . We build protections into these systems to: Ensure your security; Safeguard your data; Provide reasonable protection of private information in our possession.

## Data sharing and security

We have full-time compliance staff assigned to this. They conduct regular investigations and audits to make sure data recipients: Follow our data security requirements. Only use the data as authorized.

147.    These representations by DOL to the public established that DOL voluntarily assumed a heightened duty of care to protect the PII entrusted to it, and that DOL was aware of the standard of conduct required for the protection of that information. DOL's own representations are admissible as party admissions.

**E.    The Effect Of The Data Breach On Plaintiff Byers.**

148.    Plaintiff Byers realized in March 2020 that she had been the victim of identify theft.

149.    She found people unknown to her had taken out loans in her name, made online purchases, and applied for new credit cards in her name.

150.    Byers responded by expending time and effort in procuring credit locks, disputing the purchases, filing reports with the FTC and other agencies, and reporting matters to law enforcement.

151.    Byers' efforts in mitigating the harm from identify theft were extensive and time consuming.

152.    Then in August 2020, Plaintiff Byers did not receive her primary election ballot.

153.    She immediately contacted the Secretary of State about the issue.

154.    Nonetheless, that November, she did not receive a general election ballot and instead voted in person.

155.    To her surprise, later in November, she received a call from the King County Democrat Party informing her that her ballot envelope had been rejected due to a non-matching signature and asking her to take steps to "cure" the signature.

156.    She had no idea how that could have occurred given that she voted in person.

157.    A year later, in November 2021, after moving from King County to the Tri-Cities, Byers attempted to use the License eXpress system to update her address.

CLASS ACTION COMPLAINT - 16
BLACK V. DOL (THURSTON CNTY. SUP. CT.)

ARD LAW GROUP

158.    DOL's License eXpress system would not allow her to access her information, reporting instead that she already had an account.

159.    This made no sense, because she had never before attempted to log in to License eXpress.

160.    She contacted DOL.

161.    Investigator Muller emailed her with the form email that disclaimed DOL liability and redirected Byers to believe that the breach had been the fault of "someone." *See* Exhibit L.

162.    DOL never acknowledged that DOL itself was responsible for the theft of her PII.

163.    DOL knew at the time that it sent the form email to Byers that it had designed a "No Login" protocol that systematically disclosed the driver's license information of Byers and every Washington resident, but affirmatively misled Byers as to the reason for the theft of her PII.

164.    Byers suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (a) present, imminent, and impending injury arising from the identity theft and fraud; (b) damage to and diminution in the value of her PII, a form of property that DOL obtained from Plaintiff; and (c) violation of her privacy rights.

165.    As a result of the Data Breach, Byers anticipates continuing to spend considerable time and money on an ongoing basis to attempt to mitigate and address harms caused by the Data Breach.

166.    As a result of the Data Breach, Byers is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

**F.  The Effect Of The Data Breach On Plaintiff Black.**

167.    Plaintiff Black never received a notification from DOL that his PII was exposed in the Data Breach.

168.    However, Black has experienced indicia of identify theft, including that his PII was used to apply for unemployment benefits while he was still an employee of the Chelan County Sheriff's Office in or about 2019.

169. Although Black has experienced regular spam and phishing attempts, he has no way to know whether this is connected to DOL's data breach, because DOL has failed to inform him of the Data Breach and whether or not it knows if its disclosure of his PII resulted in an unauthorized person taking it.

170. Black continues to make reasonable efforts to protect his PII, including, but not limited to regular review of his credit reports and financial account statements.

171. Black has no idea whether his efforts are adequate, insufficient, or completely wasted because DOL has never disclosed is own knowledge of the Data Breach and what effect it might have had on Black.

172. Since learning of the Data Breach, Black has suffered emotional distress due to the release of his PII, which he believed DOL had protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII for purposes of identity theft and fraud.

173. Black remains concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

174. Black suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of his PII, a form of property that DOL obtained from Plaintiff; (b) violation of his privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft and fraud.

175. As a result of the Data Breach, Black anticipates spending considerable time and money on an ongoing basis to attempt to mitigate and address harms caused by the Data Breach.

176. As a result of the Data Breach, Black is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

**G. The Effect Of The Data Breach On The Members Of The Class.**

177. Plaintiffs' experiences resulting from the Data Breach are typical of those of the Class members.

ARD LAW GROUP

178. Given the sensitive nature of the data exposed in the Data Breach, anyone who accessed the data has the continued ability to commit identity theft, financial fraud, insurance fraud, and other identity-related fraud against Plaintiff and Class members now and into the indefinite future.

179. As a result of the Data Breach, Plaintiff and Class members will have to take a variety of steps to monitor for and safeguard against identity theft.

180. In addition, these victims of the Data Breach are at an ongoing and heightened risk of potentially devastating identity theft.

181. The Bureau of Justice Statistics confirms that identity theft causes its victims out-of-pocket monetary losses and costs the nation's economy billions of dollars every year.

182. In fact, like Plaintiff, many victims of the Data Breach have already experienced harms as a result of the Data Breach, including, but not limited to, identity theft, financial fraud, tax fraud, unauthorized lines of credit opened in their names, medical and healthcare fraud, and unauthorized access to their bank accounts.

183. As a result of the Data Breach, Plaintiffs and Class members are likely to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. losing the inherent value of their PII;

b. costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

c. costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

d. lowered credit scores resulting from credit inquiries following fraudulent activities;

e. costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach;

f. emotional distress, anxiety, and loss of privacy; and

g. the continued imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or many unauthorized third parties.

184.   Plaintiffs and Class members have spent and will spend time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit protection services, contacting their financial institutions, checking credit reports, and spending time and effort searching for unauthorized activity.

185.   The personal information exposed by DOL is highly coveted and valuable on underground or black markets. A cyber black market exists in which criminals openly post and sell stolen consumer information on underground internet websites known as the dark web, exposing consumers to identity theft and fraud for years to come.

186.   Identity thieves can use the personal information, obviously, to secure a new driver's license in the victim's name, as DOL knows was done here on an industrial scale.

187.   But they can also: (a) create fake credit cards that can be swiped and used to make purchases as if they were the real credit cards; (b) reproduce stolen debit cards and use them to withdraw cash from ATMs; (c) commit immigration fraud; (d) obtain fraudulent government benefits; (e) file a fraudulent tax return using the victim's information; (f) commit medical and healthcare-related fraud; (g) access financial accounts and records; and (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

188.   Consumers are injured every time their data is stolen and placed on the dark web, even if they have been victims of previous data breaches. Not only is the likelihood of identity theft increased, but the dark web is not like Google or eBay. It is comprised of multiple discrete repositories of stolen information. Each data breach puts victims at risk of having their information uploaded to different dark web databases and viewed and used by different criminal actors.

189.   Exposure of this information to the wrong people can have serious consequences. Identity theft can have ripple effects, which can adversely affect the future financial trajectories of

ARD LAW GROUP

victims' lives. For example, the Identity Theft Resource Center reports that respondents to their surveys in 2018-2020 described that the identity theft they experienced affected their ability to get credit cards and obtain loans, such as student loans and mortgages. For some victims, this could mean the difference between going to college or not, becoming a homeowner or not, or having to take out a high interest payday loan versus a lower-interest loan.

190. The unauthorized disclosure of Social Security numbers can be particularly damaging because Social Security numbers cannot easily be replaced. To obtain a new number, a person must prove, among other things, that he or she continues to be disadvantaged by the misuse. Thus, under current rules, no new number can be obtained until damage has been done. Furthermore, as the Social Security Administration warns, a new number "probably won't solve all your problems" because other governmental agencies and private businesses will have records under the old number. If the old credit information is not associated with the new number, the absence of any credit history under the new number may make it more difficult to get credit. According to the Attorney General of the United States, Social Security numbers "can be an identity thief's most valuable piece of consumer information."

191. The scope and severity of identity theft in the United States is staggering and growing. In 2024, the Federal Trade Commission received over 1.1 million identity theft reports, representing 18% of all consumer complaints. Consumers reported aggregate fraud losses exceeding $12.5 billion—a 25% increase from the prior year. The FBI's Internet Crime Complaint Center received 859,532 cybercrime complaints in 2024 with potential losses totaling $16.6 billion, a 33% increase from 2023. Credit card fraud topped the list of identity theft categories, with 449,032 reports—a 7.8% increase from 2023. The Identity Theft Resource Center reported that 2024 had the second-highest number of data compromises in U.S. history, with 1.35 trillion victim notices issued and five "mega breaches" each affecting between 100 million and 560 million individuals.

192. Because DOL collected and maintained Social Security numbers, names, dates of birth, driver's license numbers, and addresses in connection with its motor vehicle records, Plaintiff

and Class members face a particularly acute risk of tax identity theft. Tax identity theft occurs when criminals use stolen Social Security numbers and personal information to file fraudulent tax returns claiming refunds before the legitimate taxpayer files. The FBI's Internet Crime Complaint Center received over 1,000 complaints about tax-related identity theft in the past year alone, a 26% increase from the prior year. The Government Accountability Office and the Treasury Inspector General for Tax Administration have estimated the annual cost of tax identity theft refund fraud to taxpayers at $5.2 billion. Most workers receive W-2 forms by the end of January, but many delay filing until April—providing criminals who possess compromised Social Security numbers a months-long window to file fraudulent returns first. Victims typically discover the fraud only when their legitimate returns are rejected, leaving them unable to obtain tax refunds on which they depend.

193.    Resolving tax identity theft imposes severe and prolonged hardship on victims. Although the IRS initially committed to resolving Identity Theft Victim Assistance cases within 120 days, the agency now reports that resolution averages 623 days—more than 20 months. The Taxpayer Advocate Service has reported average cycle times of 676 days for fiscal year 2024. During this extended period, victims are denied access to their tax refunds and may be unable to meet basic financial obligations. The burden falls disproportionately on those least able to bear it: the Taxpayer Advocate Service reports that 69% of identity theft victims have adjusted gross income at or below 250% of the Federal Poverty Level. For these low-income taxpayers, the loss of an expected refund—and the months or years spent attempting to reclaim it—can cause cascading financial consequences including inability to pay rent, utilities, and other essential expenses.

194.    Identity theft also causes severe and lasting damage to victims' credit reports and scores. The Consumer Financial Protection Bureau reports that consumers attempting to resolve credit reporting inaccuracies related to identity theft face a "complicated and lengthy process." The CFPB's Supervisory Highlights further reveal that consumer reporting companies frequently fail to properly block or remove information related to identity theft—



refusing to honor consumer requests based on overly broad criteria, failing to inform consumers when blocks are denied or rescinded, and failing to provide victims with summaries of their rights under federal law. Fraudulent accounts that are not promptly identified and disputed can remain on a victim's credit report for up to seven years from the date of first delinquency, during which time the victim may be denied credit, charged higher interest rates, rejected for employment, or denied housing.

195.    There may be a significant time lag—a year or more—between when personal information is stolen and when it is actually used to commit identity theft. According to the Government Accountability Office, "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years." As a result, the full extent of harm from the Data Breach cannot yet be known, and Plaintiff and Class members face a continuing and indefinite risk of identity theft, tax fraud, credit damage, and financial loss. While the FTC reported a median loss of $497 across all fraud categories in 2024, this figure dramatically understates the true cost of identity theft when considering lost tax refunds, long-term credit damage, time invested in resolution, legal fees, emotional distress, and the ongoing risk of future misuse of the compromised PII.

## V. CLASS ALLEGATIONS.

196.    Plaintiffs brings this action as a class action pursuant to Civil Rule 23(a) and 23(b)(3), on behalf of the following Class and Subclass of persons:

**Class:** All Washington persons whose driver's license information was compromised in the data breach of the Washington Department of Licensing License eXpress system.

**Identity Theft Subclass:** All members of the Class who suffered actual, documented financial losses from identity theft as a result of the Data Breach.

197.    Excluded from the Class and Subclass are any executives, appointees, and investigators of the Washington Department of Licensing; any assigned judge, and members of the immediate family and/ or household of the excluded persons.

CLASS ACTION COMPLAINT - 23
BLACK V. DOL (THURSTON CNTY. SUP. CT.)

ARD LAW GROUP

198. Plaintiffs reserves the right to amend the Class and Subclass definitions if further investigation and/or discovery indicate that the Class and Subclass definitions should be narrowed, expanded, or otherwise modified.

199. On information and belief, the Class numbers over 5,000,000 persons.

200. On information and belief, the Identity Theft Subclass numbers over 5,000 persons.

201. The number of individuals and entities who comprise the Class and Identity Theft Subclass are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action, rather than in individual actions, will benefit both the parties and the courts. Class members and Identity Theft Subclass members are readily identifiable from records maintained by Defendant, and may be notified of the pendency of this action by mail or electronic mail using the form of notice similar to that customarily used in class actions.

202. Plaintiffs' claims are typical of the claims of the other members of the Class. All members of the Class have been and/or continue to be similarly affected by Defendant's wrongful conduct as complained of herein. Plaintiffs are unaware of any interests that conflict with or are antagonistic to the interests of the Class.

203. Plaintiffs will fairly and adequately protect the Class members' interests and have retained counsel competent and experienced in class actions and complex litigation, and particularly in litigation against the State of Washington.

204. Plaintiffs and their counsel will adequately and vigorously litigate this class action, and Plaintiffs are aware of their duties and responsibilities to the Class.

205. Defendant has acted with respect to the Class in a manner generally applicable to each Class member. Common questions of law and fact exist as to all Class members and predominate over any questions affecting individual Class members. The questions of law and fact common to the Class include, *inter alia*: (a) whether DOL failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach; (b) whether DOL's conduct was negligent; (c) whether DOL violated the agency data breach notification requirements of RCW 42.56.590; (d) the nature and scope of

the PII exposed through the License eXpress system; and (e) whether Plaintiffs and the Class are entitled to damages and/or injunctive relief.

206.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as the injury and/or damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible as a practical matter for Class members to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

207.    Defendant has acted on grounds generally applicable to the entire Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## VI. CAUSES OF ACTION.

### A. First Cause Of Action: Negligence

208.    Plaintiffs incorporates by reference all foregoing factual allegations.

209.    DOL collected, stored, and transferred personally identifying information from Plaintiff and the Class and had a corresponding duty to protect such information from unauthorized access.

210.    DOL failed to inform Plaintiffs and the Class that its systems were inadequate to safeguard sensitive information and that the vulnerabilities in its systems resulted in DOL disclosing the PII of Plaintiffs and the Class.

211.    The sensitive nature of the personally identifying information and economic value of it to others necessitated security practices and procedures sufficient to prevent unauthorized access to the personally identifying information.

212.    DOL failed to implement and maintain adequate security practices and procedures to prevent the Data Breach.

213.    DOL likewise failed to test, update, and patch (including curing known vulnerabilities) its network systems as necessary.

214.    It was reasonably foreseeable to DOL that its failure to implement and maintain reasonable security procedures and practices would leave the sensitive information in its systems vulnerable to breach and could thus expose the owners of that information to harm.

215.    Furthermore, given the known risk of well known, major data breaches, including the earlier breach of DOL's POLARIS system, Plaintiffs and the Class are part of a well-defined, foreseeable, finite, and discernible group that was at high risk of having their personally identifying information stolen.

216.    DOL's duty of care arose as a result of its knowledge that individuals trusted the DOL to protect their confidential data that they provided to it. Only the DOL was in a position to ensure that its own protocols were sufficient to protect against the harm to Plaintiffs and the Class from a data breach of its own systems.

217.    Moreover, DOL's Data Governance Policy 1.7.1 states, "The Agency has an obligation to protect the privacy of the customers we serve."

218.    DOL also had a duty to use reasonable care in protecting confidential data because it committed to comply with industry standards for the protection of personally identifying information and committed to the public to protect the privacy of information the public provided DOL.

219.    DOL knew, or should have known, of the vulnerabilities in its security practices and procedures, and the importance of adequate security to the owners of sensitive data.

220.    Plaintiffs and the Class have suffered harm as a result of DOL's negligence. These victims suffered diminished value of their sensitive information. Plaintiffs and the Class also lost control over the personally identifying information exposed, which subjected each of them to a greatly enhanced risk of identity theft, medical identity theft, credit and bank fraud, Social Security fraud, tax fraud, and myriad other types of fraud and theft, in addition to the time and expenses spent mitigating those injuries and preventing further injury.

221.    Consistent with RCW 4.96.020, Plaintiffs have satisfied the pre-suit notice requirement or Defendant has otherwise waived the requirement. Plaintiff Black, on his own behalf and on

behalf of the Class he seeks to represent, presented a Tort Claim Form to the Department of Licensing for its tortious conduct as set forth herein. More than sixty days have elapsed after his claims were presented. *See* RCW 4.96.020.

**B. Second Cause of Action: Violation of RCW 42.56.590.**

222.    Plaintiffs incorporates by reference all foregoing factual allegations.

223.    DOL is an "agency" within the meaning of RCW 42.56.010.

224.    DOL owns, licenses, and maintains data containing the personal information of Plaintiffs and Class members, including their names, Social Security numbers, dates of birth, driver's license numbers, and addresses.

225.    RCW 42.56.590(1) requires a state or local agency that owns or licenses data containing personal information to disclose any breach of the security of its system to any resident of this state whose personal information was, or is reasonably believed to have been, acquired by an unauthorized person.

226.    RCW 42.56.590(15) requires that such notification be made "in the most expedient time possible and without unreasonable delay," no more than 45 calendar days after the breach was discovered.

227.    DOL knew of the security vulnerability in the License eXpress system no later than 2019, when it assigned case number 19-0109 to investigate the first identified victims. DOL knew that personal information was being accessed and used by unauthorized persons on an ongoing and massive scale.

228.    Despite this knowledge, DOL failed to notify Plaintiffs and Class members of the breach within 45 calendar days of discovering it. Although DOL sent individual notification letters to a subset of victims identified through batch-fraud investigations, those letters failed to disclose the systemic nature of the vulnerability, its duration, or the full scope of data at risk, and DOL never provided any notification to the millions of Washington residents whose PII remained exposed through the same portal.

229.    DOL's failure to provide timely notification violated RCW 42.56.590.

CLASS ACTION COMPLAINT - 27
BLACK V. DOL (THURSTON CNTY. SUP. CT.)

ARD LAW GROUP

230. Pursuant to RCW 42.56.594(2)(a), any consumer injured by a violation of RCW 42.56.590 may institute a civil action to recover damages.

231. Plaintiffs and Class members were injured by DOL's failure to notify. During the period in which DOL should have provided notification but did not, Plaintiffs and Class members were deprived of the opportunity to take protective measures—including monitoring their credit, freezing their accounts, placing fraud alerts, filing identity theft reports, and taking other steps to prevent or mitigate identity theft and fraud.

232. Had DOL provided timely notification as required by RCW 42.56.590, Plaintiffs and Class members could have taken such protective measures and could have avoided or mitigated the harm they suffered.

233. Pursuant to RCW 42.56.594(2)(b), any agency that violates, proposes to violate, or has violated RCW 42.56.590 may be enjoined.

234. The rights and remedies available under this cause of action are cumulative to each other and to any other rights and remedies available under law, including the negligence claim set forth above. RCW 42.56.594(2)(c).

235. Any waiver of the provisions of RCW 42.56.590 is contrary to public policy, and is void and unenforceable. RCW 42.56.594(1).

## VII. PRE-SUIT NOTICE.

236. Consistent with RCW 4.92.100, Plaintiffs have satisfied the pre-suit notice requirement or Defendant has otherwise waived the requirement. Plaintiff Black, on his own behalf and on behalf of the Class he seeks to represent, presented a Tort Claim Form to the Department of Enterprise Services' Office of Risk Management for the State's tortious conduct as set forth herein. More than sixty days have elapsed after his claims were presented. See RCW 4.92.100.

## VIII. PRAYER FOR RELIEF.

237. Plaintiffs, individually and on behalf of the Class, requests that the Court enter judgment against DOL as follows:

CLASS ACTION COMPLAINT - 28

BLACK V. DOL (THURSTON CNTY. SUP. CT.)

ARD LAW GROUP

A. An order certifying the proposed Class pursuant to Civil Rule 23 and appointing Plaintiffs and their counsel to represent the Class;

B. An order awarding Plaintiff and Class members monetary relief, including actual damages;

C. An order awarding injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as necessary to protect the interests of Plaintiffs and Class members, including, but not limited to, an order:

   a. Prohibiting DOL from engaging in the wrongful and unlawful acts described herein;

   b. Requiring DOL to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and state or local laws;

   c. Requiring DOL to delete, destroy, and purge the PII of Plaintiffs and Class members from any internet-facing or cloud-connected database unless DOL can provide to the Court reasonable justification for the retention and use of such information storage media when weighed against the privacy interests of Plaintiffs and Class members;

   d. Requiring DOL to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class members;

   e. Prohibiting DOL from maintaining the PII of Plaintiffs and Class members on a cloud-based database;

   f. Requiring DOL to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on DOL's systems on a periodic basis, and ordering DOL to promptly correct any problems or issues detected by such third-party security auditors;

   g. Requiring DOL to engage independent third-party security auditors and internal personnel to run automated security monitoring;

CLASS ACTION COMPLAINT - 29

*BLACK v. DOL* (THURSTON CNTY. SUP. CT.)

ARD LAW GROUP

h. Requiring DOL to audit, test, and train its security personnel regarding any new or modified procedures;

i. Requiring DOL to segment data by, among other things, creating firewalls and access controls so that if one area of DOL's network is compromised, unauthorized persons cannot gain access to other portions of DOL's network;

j. Requiring DOL to conduct regular database scanning and securing checks;

k. Requiring DOL to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiffs and Class members;

l. Requiring DOL to routinely and continually conduct internal training and education, and, on an annual basis, to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

m. Requiring DOL to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with DOL's policies, programs, and systems for protecting PII;

n. Requiring DOL to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor DOL's information network for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

o. Requiring DOL to meaningfully educate all Class members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

p. Requiring DOL to implement logging and monitoring programs sufficient to track traffic to and from DOL's servers; and

q. For a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate DOL's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment;

D. An award of damages, including actual, nominal, statutory, consequential, and punitive damages, as permitted by law;

E. An award of attorney's fees, costs, and expenses, as permitted by law;

F. An award of pre-judgment and post-judgment interest, as permitted by law;

G. Leave to amend this Complaint to conform to the evidence produced at trial; and

H. Such other and further relief as this Court may deem just and proper.

///

///

///

///

///

///

May 6, 2026.

ARD LAW GROUP PLLC

By: _____

Joel B. Ard, WSBA # 40104
P.O. Box 281
Kingston, WA 98346
206.701.9243
Joel@Ard.law
Attorneys for Plaintiff William Black
and the Putative Class

CLASS ACTION COMPLAINT - 31

BLACK V. DOL (THURSTON CNTY. SUP. CT.)

ARD LAW GROUP

| Procedure: 05.A.001 | Investigating Online Services Fraud | |
|---|---|---|

| Effective date: | March 17, 2025 |
|---|---|

| Action by: | Step | Action |
|---|---|---|
| Investigator | 1. | **Receives** online fraud allegation. |
| | 2. | **Reviews** allegation, see appendix Identifying Online Services Fraud Guide.<br><br>   o  If no online fraud suspected, but still possible fraud, **follows** procedure for specific investigation instead.<br>   o  If no fraud suspected at all, **ends** procedure here. |
| | 3. | **Places** See DVI indicator on record, see task Adding Indicators to Records. |
| | 4. | **Moves** allegation (including email or voicemail, marked Unread) to Online Fraud folder in Outlook.<br>   o  If allegation was submitted through DOL OLM HQ Fraud (indicating customer is in office), **sends** Teams message to Online Fraud Team members. |
| Online Fraud Team | 5. | **Reviews** possible fraudulent online transaction, see appendix Online Services Fraud Investigation Guide. |
| | 6. | **Contacts** customer, see appendix Online Services Fraud Victim Contact Guide.<br><br>  o  If no fraud suspected:<br>    a) **Deletes** Online Services Fraud Intake Report, if started.<br>    b) **Removes** See DVI indicator, if requested by customer, see task Removing Indicators from Records.<br>    c) **Ends** this procedure.<br>  o  If fraud suspected and See DVI indicator has not been added yet, **adds** indicator, see task Adding Indicators to Records. |
| | 7. | **Pulls** fraudulent issuance from WebLink, if applicable, see task Processing Factory Pulls in Weblink. |
| | 8. | **Sends** customer Victim Assistance Email, see appendix Victim Assistance Email Template. |

| | | |
|---|---|---|
| | 9. | **Enters** notes in WebLink and DRIVES, see tasks Adding Comments in Weblink and Adding Notes to DRIVES Record.<br>• Note in WebLink on fraudulent issuance: "Issuance is Online Fraud."<br>• Note in DRIVES:<br>    ■ Fraudulent issuance: "Online fraud victim. (type of issuance) issued on (date) is fraud. Hold placed to stop online access."<br>    ■ Access only: "Online fraud victim. Access only. Hold placed to stop online access." |
| | 10. | **Verifies** customer's identity, if not already verified at DLO.<br><br>  o If customer's identity cannot be verified manually, **contacts** customer and advises them to visit a DLO. Do not proceed until identity is verified. |
| | 11. | **Corrects** customer's address, if incorrect. |
| | 12. | **Requests** removal of DHP, if present, see appendix DHP Removal Request Template.<br><br>• **Obtains** law enforcement or FTC report number from the customer prior to sending a request to have the DHP removed.<br>• **Notifies** customer when DHP has been removed. |
| | 13. | **Changes** customer's DLN, see task Changing Driver License Number (DLN). |
| | 14. | **Issues** the customer an NFR, if eligible.<br>  o If customer is in a DLO, **asks** LSR to complete NFR with appropriate corrections.<br>  o If customer is not in a DLO, **requests** NFR at DOLNFRRequests@dol.wa.gov, see appendix NFR Issuance Email Template. **Provides** all data elements that need to be corrected.<br>Note: If the customer's credential expires within a year, or they wish to go to an office, do not send a request. **Advises** the customer to inform the LSR of corrections needed. |
| | 15. | **Prepares** victim notification letter and cover sheet, see task Generating Online Services Fraud Victim Letters. |
| | 16. | **Searches** for data related to IP address(es) used during the transaction, see appendix Investigative Website Resources. |

| | 17. | **Completes** Online Fraud Spreadsheet in SharePoint, see task Completing Online Services Fraud Spreadsheet. |
|---|---|---|
| | 18. | **Searches** for additional victims. <br><br> • **Searches** suspect IP address(es) using DRIVES Snapshot Search, see task Searching for IP Addresses. <br> • **Searches** fraudulent email address(es), phone number(s), and username(s) in DRIVES, see task Searching for Records. <br> • **Searches** Online Fraud Spreadsheet for IP fraudulent address(es), email address(es), phone number(s), and username(s). <br>     o   If additional victims are located, **contacts** customer(s) to confirm/process fraud or **contacts** a Supervisor for further instructions. |

(R-11-25-2020)

| Task:<br>05.A.003 | Processing Online Services Fraud Victim Letters |
|---|---|

| Effective date: | March 17, 2025 |
|---|---|

**Action**: When victim notification letters are ready to print and send, the **Investigator**:

1. **Navigates** to Print & Mail- Victim Notification Letters folder in the G: drive.
2. **Prints** two copies of each Victim Letter and one copy of each associated cover sheet, see task Using Multi-Function Printers.
3. **Mails** one copy of Victim Letter with ID Theft Brochure to customer's confirmed address, see task Mailing DVI Documents.
4. **Attaches** cover sheet to other copy of Victim Letter with paperclip.
5. **Places** cover sheet packet in outgoing Imaging box.
6. **Deletes** original Victim Letters and cover sheets from Print & Mail folder.
7. **Updates** Online Service Fraud Intake Report Form and Online Fraud Spreadsheet indicating letters have been sent.

(R-01-12-2022)

| Task:<br>05.A.004 | Completing Online Services Fraud Spreadsheet |
|---|---|

| Effective date: | March 17, 2025 |
|---|---|

**Action:** To complete the Online Services Fraud Spreadsheet, the **Investigator**:

1. **Opens** Online Services Fraud Spreadsheet in SharePoint.
2. **Locates** next empty row at the bottom of the sheet.
3. **Enters** information into all columns in corresponding fields:
   - Customer's name by first name, middle name, and last name (capitalized). Example: John Doe SMITH.
   - IP address(es) by IP address and time. Example: 127.0.0.1 01:01:01 hrs.
   - o If there are blank fields due to no information, **enters** "None."
   - o If there are fields that are not applicable, **enters** "N/A."

| Task:<br>05.A.006 | Reviewing DRIVES Web Logon and Request<br>Information |
|---|---|

| Effective date: | March 17, 2025 |
|---|---|

**Action**: To view Web Logon and Web Request information, the **Investigator**:

**Reviews Web Logon Information:**

1. **Navigates** to customer's Account Springboard in DRIVES.
2. **Selects** Registration tab, Logon subtab.
3. **Selects** License eXpress for Individuals hyperlink for the transaction.

    Note: The active Web Logon profile hyperlink will be listed in blue. Any inactive profile hyperlinks will be grayed out.

**Reviews Web Request Information:**

1. **Navigates** to the customer's Account Springboard in DRIVES.
2. **Selects** CRM tab, Web Requests subtab.
3. **Selects** Change Date.
4. **Enters** a date to search from in the Change Date pop-up window.
5. **Selects** OK.
6. **Selects** Confirm # hyperlink for transaction to be reviewed.

(R-01-12-2022)

| Task:<br>05.A.007 | Generating Imaging Cover Sheet |
| --- | --- |

| Effective date: | March 17, 2025 |
| --- | --- |

**Action**: To generate an Imaging Cover Sheet in DRIVES, the **Investigator**:

1. **Navigates** to Customer's Account Springboard in DRIVES.
2. **Selects** I Want To...
3. **Selects** Add Cover Sheet.
4. **Selects** Correspondence from drop-down list.
5. **Selects** Save.
6. **Selects** Next.
7. **Selects** Print.
8. **Selects** Print.
9. **Selects** Download icon.

(R-01-12-2022)

| Appendix: 05.A.902 | Online Services Fraud Victim Contact Guide |
|---|---|

| Effective date: | March 17, 2025 |
|---|---|

When contacting an Online Services Fraud Victim, the **Investigator**:

- **Complete the Online Services Fraud Intake Report while contacting the customer.**

  Note: This report is required if the alleged fraud proceeds to a full investigation.

- **Review the information obtained during the initial review of the transaction(s) with the customer, see appendix Online Services Fraud Investigation Guide:**
  - Verify which transaction(s) were fraudulent.
  - Did customer receive the issuance(s).
  - Whether customer received DHP letter(s) or other communication(s) from DOL.

- **Determine and document customer's information:**
  - Current address, phone number, and email address.
  - Correct information for any data changed by the suspect(s).
  - Case numbers from law enforcement or Federal Trade Commission (FTC).
  - Any possible suspect(s) information regarding the fraud.

- **Explain next steps of the investigation and what information, if any, are needed from them.**
  - o If no fraud, ask if they would like to keep the see DVI indicator (or have one placed) on their record.

- **Explain to customers with enhanced credentials, the impact it will have when traveling abroad when a new one is issued.**

(R-11-25-2020)

Claim#057440504



**STATE OF WASHINGTON**
**DEPARTMENT OF LICENSING**
*PO Box 9020  •  Olympia, Washington 98507-9020*

**VICTIM NOTIFICATION**

May 15, 2024

Dear

This letter is notification that another person ordered three online Duplicate Driver License in your name using your personal identifiable information on 04/23/2024 and 4/30/2024. The person used the Washington State, Department of Licensing, No Logon online services website to request and obtain the document.

The department has not identified the subject. When Driver and Vehicle Investigations (DVI) became aware of the fraud, a lock was placed on your DOL record. The lock prevents any unauthorized online access. The lock will also prevent you from accessing your DOL account online. If you have any questions regarding the lock, or other safeguards, please contact DVI at the information listed below.

We are prohibited from providing personally identifying information to anyone other than law enforcement for an official investigation.

It is recommended you contact your local law enforcement to have your criminal record checked and file an identity theft police report. Your local law enforcement office may contact us for further information regarding this matter.

I have enclosed an Identity Theft brochure for your reference.

This letter is for your records. However, it is important you make contact with the Department of Licensing regarding your record as soon as possible. You may contact us by telephone at (360) 902-3915, by email at fraud@dol.wa.gov or by fax at (360) 570-1246.

Sincerely,

Andrew Nunes
Investigator 2
Driver and Vehicle Investigations
Programs and Services Division

Enclosure

We are committed to providing equal access to our services.
For more information, visit dol.wa.gov/access. (TDD/TTY call 711).



**STATE OF WASHINGTON**
DEPARTMENT OF LICENSING
*PO Box 9020 Olympia, Washington 98507-9020*

## VICTIM NOTIFICATION

March 30, 2026

Click or tap here to enter text.
Click or tap here to enter text.
Click or tap here to enter text.

Dear Click or tap here to enter text.,

This letter is notification that another person obtained access to your online License Express account using your name and personal identifiable information on [dates]. The person did not request any documents or change any of your personal identifiable information.

The department has not identified the subject. When Driver and Vehicle Investigations (DVI) became aware of the fraud, a lock was placed on your DOL record. The lock prevents any unauthorized online access. The lock will also prevent you from accessing your DOL account online. If you have any questions regarding the lock, or other safeguards, please contact DVI at the information listed below.

We are prohibited from providing personally identifying information to anyone other than law enforcement for an official investigation.

It is recommended you contact your local law enforcement to have your criminal record checked and file an identity theft police report. Your local law enforcement office may contact us for further information regarding this matter.

I have enclosed an Identity Theft brochure for your reference.

This letter is for your records. You may contact us by telephone at (360) 902-3915, by email at fraud@dol.wa.gov or by fax at (360) 570-1246.

Sincerely,

Click or tap here to enter text.
Choose an item.
Driver and Vehicle Investigations
Programs and Services Division

Enclosure



**STATE OF WASHINGTON**
DEPARTMENT OF LICENSING
*PO Box 9030, Olympia, Washington 98507-9030*

VICTIM NOTIFICATION

March 30, 2026

Click or tap here to enter text.
Click or tap here to enter text.
Click or tap here to enter text.

Dear Click or tap here to enter text.,

This letter is notification that another person obtained access to your online License Express account using your name and personally identifiable information on Click or tap to enter a date.. The person did not request any documents or change any of your personal identifiable information.

The department has not identified the subject. When Driver and Vehicle Investigations (DVI) became aware of the fraud, a lock was placed on your DOL record. The lock prevents any unauthorized online access. The lock will also prevent you from accessing your DOL account online. If you have any questions regarding the lock, or other safeguards, please contact DVI at the information listed below.

We are prohibited from providing personally identifiable information to anyone other than law enforcement for an official investigation.

It is recommended you contact your local law enforcement to have your criminal record checked and file an identity theft police report. Your local law enforcement office may contact us for further information regarding this matter.

I have enclosed an Identity Theft brochure for your reference.

This letter is for your records. However, it is important you make contact with the Department of Licensing regarding your record as soon as possible. You may contact us by telephone at (360) 902-3915, by email at fraud@dol.wa.gov or by fax at (360) 570-1246.

Sincerely,

Click or tap here to enter text.
Choose an item.
Driver and Vehicle Investigations
Programs and Services Division

Enclosure

We are committed to providing equal access to our services.
For more information, visit dol.wa.gov/access. (TDD/TTY call 711).

**Gould, Chelsea (DOL)**

**To:**        DOL DO DHP
**Subject:**   DHP Removal Request - <Victim DLN>

Hello,

Please remove the DHP from record [victim DLN]. The customer is a confirmed victim in my online fraud case.

Please run the payment information for additional victims.

Report number [###] filed with the [agency/department name].

Thank you,

**Gould, Chelsea (DOL)**

**To:** DOL CR DE NFR Requests
**Subject:** NFR Request <customer previous DLN>

| *NFR* | Approval Needed? | | Supervisor Name: | |
|---|---|---|---|---|
| IF FACTORY PULL NEEDED: | Which DLO? | | DLO Address | |
| DLN# | | | Document Type(s): | |
| NAME | | | | |
| PHONE # | | | Language: | |
| EMAIL | Only Required for Temp: | | | |
| ADDRESS | Physical: | | Mailing: | |
| IF ADDRESS HAS CHANGED, REASON: | | | | |

| | New DLN# | |
|---|---|---|
| | Gender | |
| FOR FRAUD: | Eye Color | |
| NFR UPDATES | Height | |
| TO: | Weight | |
| | Veteran? | |
| | Organ Donor | |

1

**Gould, Chelsea (DOL)**

**Subject:**          Online Fraud Information

Please send the photo as requested.
Below are some steps you will want to take to protect yourself from future identity fraud/theft.

1.  Contact your local police department and file a police report stating you have been a victim of identity theft and someone has gained unauthorized access to your record with the Department of Licensing (DOL).
2.  Contact the Federal Trade Commission (FTC) and the Attorney General's (AG) Office to report the fraud as well. You can find the numbers on the internet.
3.  Place blocks/freezes on your credit reports. This is normally done by contacting the credit bureau directly. The information to add a block/freeze can be found on the respective websites.
4.  Watch your email for notices from DOL stating that your account access has been changed. These can typically be routed to your junk mail/spam folder.
5.  Watch your mail for dishonored payment notices from DOL. This will indicate that the suspect has used a fraudulent payment method to obtain a license/ID card in your name.
6.  Watch your mail service, if you notice that you are not getting mail regularly as you normally would, contact your Postmaster General and see if your mail has been held. You can also contact the US Postal Inspectors at 877-876-2455 to add stops to prevent changes to your mail service.
7.  Sign up for Informed Delivery through the United States Postal Service (USPS). This will give you an actual snapshot of the mail being delivered that day.
8.  If at all possible, get a locking mailbox.

| Equifax | http://www.equifax.com | (800) 525-6285 |
|---|---|---|
| Experian | http://www.experian.com | (888) 397-3742 |
| Trans Union | http://www.transunion.com | (800) 680-7289 |
| U.S. Federal Trade Commission | http://www.ftc.gov | (877) 438-4338 |

If you experience any other oddities, it would be best to notify me to see if there is anything on my end I can do. Please do not hesitate to contact me with questions or concerns.

i

The Wayback Machine - https://web.archive.org/web/20231213041107/https://watech.w...

🔒 CUSTOMER PORTAL    >

Search

MENU

Services Menu

Services A-Z

Customer Resources

Service Action Plans

Service Forms

Home / Services / Security / Fortress Anonymous

# Fortress Anonymous

Fortress Anonymous provides a secure, encrypted connection to information hosted on state websites. Agencies retain self-administration rights to their applications and maintain control.

Fortress Anonymous protects the source identity for many public services, including the Unemployment Claims Application, the Division of Child Support New Hire Reporting program, and the Vehicle Tab renewal service.

# Features & Benefits

- A production and test environment to support registration and setup for public web applications.
- Mask web application IP addresses to protect the source data from being exposed to the internet.
- URL masking through real-time translation of web application URLs.
- Option for proxy configurations with agency branded URLs.
- Technical staff members are on call 24/7 to resolve any problems.

# Pricing

The Fortress Anonymous Gateway is part of a security allocation fee to agencies. The Security Gateway allocation is a monthly fee.

| Description | Fee |
|---|---|
| Fortress Anonymous for partner agencies is included in the monthly Security Gateway allocation. | No additional cost |
| Fortress Anonymous for partner agencies not included in the monthly Security Gateway allocation with more than 50 FTEs. | $1,500/mo. base fee plus a per-FTE fee and a per-application fee |
| Fortress Anonymous for partner agencies not included in the monthly Security Gateway allocation with less than 50 FTEs. | $500/mo. base fee and a per-application fee |
| One-time set up fee | Five percent (5%) of the monthly fee |

# How to Order

Contact your agency Business Relationship Manager (BRM) or contact the WaTech Support Center at 360.586.1000 or 855.928.3241, or email support@watech.wa.gov to schedule a readiness consultation.

# Pre-service requirements

To obtain services from WaTech, eligible organizations must first enter into a Master Service Agreement (MSA). See if you qualify for an MSA.

# Service Forms & Documents

- Service Action Plan

# Contact

WaTech Support Center
support@watech.wa.gov
855-928-3241
360-586-1000



6:09

2 Messages

ID Theft - BYERS



Found in iCloud Inbox

**Kyle Muller**                                                11/2/21
To:

Good afternoon,

Please send the photo as requested.
Below are some steps you will want to take to protect
yourself from future identity fraud/theft.

1. Contact your local police department and file a
   police report stating you have been a victim of
   identity theft and some has gained unauthorized
   access to your record with the Department of
   Licensing (DOL). Please reply back to this email
   with the report number and the name of the agency
   you filed with.
2. Contact the Federal Trade Commission (FTC) and
   the Attorney General's (AG) Office to report the
   fraud as well. You can find the numbers on the
   internet.
3. Place blocks/freezes on your credit reports. This is
   normally done by contacting the credit bureau
   directly. The information to add a block/freeze can
   be found on the respective websites.
4. Watch your email for notices from DOL stating that
   your account access has been changed. These can
   typically be routed to your junk mail/spam folder.
5. Watch your mail for dishonored payment notices
   from DOL. This will indicate that the suspect has
   used a fraudulent payment method to obtain a
   license/ID card in your name.
6. Watch your mail service, if you notice that you are
   not getting mail regularly as you normally would,
   contact your Post Master General and see if your
   mail has been held. You can also contact the US
   Postal Inspectors at 877-876-2455 to add stops to
   ur mail service.





6:16

2 Messages

**ID Theft - BYERS**

1. Contact your local police department and file a police report stating you have been a victim of identity theft and some has gained unauthorized access to your record with the Department of Licensing (DOL). Please reply back to this email with the report number and the name of the agency you filed with.
2. Contact the Federal Trade Commission (FTC) and the Attorney General's (AG) Office to report the fraud as well. You can find the numbers on the internet.
3. Place blocks/freezes on your credit reports. This is normally done by contacting the credit bureau directly. The information to add a block/freeze can be found on the respective websites.
4. Watch your email for notices from DOL stating that your account access has been changed. These can typically be routed to your junk mail/spam folder.
5. Watch your mail for dishonored payment notices from DOL. This will indicate that the suspect has used a fraudulent payment method to obtain a license/ID card in your name.
6. Watch your mail service, if you notice that you are not getting mail regularly as you normally would, contact your Post Master General and see if your mail has been held. You can also contact the US Postal Inspectors at 877-876-2455 to add stops to prevent changes to your mail service.
7. Sign up for Informed Delivery through the USPS. This will give you an actual snapshot of the mail being delivered that day.
8. If at all possible, get a locking mailbox.

| Equifax | http://www.equifax.com | (800) 525-6285 |
| Experian | http://www.experian.com | (888) 397-3742 |